# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-3602

_____

K.W.P., By His Parent and Next Friend

*Plaintiff - Appellee*

v.

Kansas City Public Schools; Brandon Craddock, In His Individual Capacity; Anne Wallace, In Her Individual Capacity

*Defendants - Appellants*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: February 13, 2019
Filed: August 1, 2019

_____

Before SMITH, Chief Judge, BENTON and STRAS, Circuit Judges.

_____

SMITH, Chief Judge.

K.W.P., an elementary student, sued Kansas City Public Schools (KCPS), Officer Brandon Craddock, and Principal Anne Wallace for violations of K.W.P.'s rights under the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983. K.W.P. alleged that Officer Craddock unreasonably seized him and used excessive force by handcuffing him and failing to remove the handcuffs. He alleged that

Principal Wallace approved Officer Craddock's seizure by failing to instruct Officer Craddock to remove the handcuffs despite K.W.P. posing no imminent threat to anyone and complying with instructions. K.W.P. sued KCPS for municipal liability and failure to train and supervise Officer Craddock on the use of handcuffs on elementary-age children. Officer Craddock and Principal Wallace moved for summary judgment based on qualified immunity on the claim of unreasonable seizure and excessive force, and KCPS moved for summary judgment on the municipal liability claim. The district court determined that disputed material facts precluded dismissal of K.W.P.'s claims against Officer Craddock and Principal Wallace. The court also denied summary judgment to KCPS. KCPS, Officer Craddock, and Principal Wallace appeal the denial of summary judgment.

Construing the facts in the light most favorable to K.W.P., we conclude that neither Officer Craddock nor Principal Wallace violated K.W.P.'s constitutional rights; thus, they are entitled to qualified immunity on K.W.P.'s claim of unreasonable seizure and excessive force. As a result, we necessarily hold that K.W.P.'s municipal liability claim also fails. Therefore, we reverse the district court's denial of summary judgment to Officer Craddock, Principal Wallace, and KCPS and remand for entry of summary judgment in their favor on K.W.P.'s claims.

## I. *Background*
### a. *Underlying Facts*

"We recite the facts in the light most favorable to [K.W.P.], as the nonmoving part[y]." *O'Brien v. Dep't of Agric.*, 532 F.3d 805, 808 (8th Cir. 2008).

K.W.P., a seven-year-old boy in the second grade, attended George Melcher Elementary School within the KCPS system. On April 30, 2014, while in Ms. Beverly Cole's class, a classmate teased K.W.P. incessantly, distracting him from his school work. The classmate's actions antagonized him to the point of frustration. In response, K.W.P. yelled at the classmate and desired to physically confront him,

-2-

stating that he "didn't get to push [the student], but [he] wanted to." Defs.'
Suggestions in Supp. of Mot. for Summ. J., Ex. 2, K.W.P. Dep., at 14, *K.W.P. v. Kan.
City Pub. Schs.* (W.D. Mo. Aug. 30, 2017), ECF No. 70-2. As tensions escalated, a
second adult school employee entered the classroom. According to K.W.P., she was
"yelling" at him to "sit down" and telling him "you better sit down, you are about to
get in trouble, the security guard [is] coming." *Id.* at 14–15. According to K.W.P., that
woman made him "even madder." *Id.* at 15. K.W.P. did not pay any attention to what
she was saying. K.W.P. admitted that he was "hollering" at the other student things
such as "leave me alone, I'm not paying attention to you." *Id.* at 14.

At this point, Officer Craddock, who was in the school at the time, was asked
by a staff member to step inside Ms. Cole's classroom to assist with an "out of
control" student. Pl.'s Suggestions in Opp'n to Defs.' Mot. for Summ. J. at 20, ¶ 27,
*K.W.P. v. Kan. City Pub. Schs.* (W.D. Mo. Sept. 20, 2017), ECF No. 86.[1] Officer
Craddock is employed by KCPS as a patrol officer. Officer Craddock did not know
K.W.P. or have any previous dealings with him. K.W.P. testified that by the time he
noticed Officer Craddock, he was "sitting in [his] seat." Defs.' Suggestions in Supp.
of Mot. for Summ. J., Ex. 2, K.W.P. Dep., at 15. K.W.P. believed he had "stopped"
"hollering" when he noticed Officer Craddock. *Id.* K.W.P. clarified:

> I remember, [Officer Craddock]—like at first I was yelling, because I
> didn't know he was there, I said [omitted], I just heard somebody shout
> . . . "if you don't get up in three seconds, I'm going to come and get
> you." And then—like it was a very deep voice. And then as soon as I
> heard that, like I just had turned around and then I looked back at
> [omitted] and then I just started to be still.

---

[1] K.W.P. contests that he was "out of control" but does not contest that Officer
Craddock was *told* that K.W.P. was out of control. *Compare id*. at ¶ 29, *with id.* at
¶ 27.

-3-

And then that's when he was counting down to three. And as soon as he said 1[,] I had pushed like, pushed out my chair like that and then got up and walked towards him.

*Id.* at 17.

Officer Craddock asked K.W.P. to accompany him into the hallway. After the second request, K.W.P. complied and went into the hallway. K.W.P. admitted that he did not want to go with Officer Craddock. K.W.P. testified that he responded to Officer Craddock's request to accompany him by "push[ing] [his] chair out in a negative way" because he was "angry," "emotional," and "didn't want to go with [Officer Craddock]." *Id.*

Once in the hallway, Officer Craddock told K.W.P. that he was not in trouble. Officer Craddock wanted K.W.P. to follow him and would not allow K.W.P. back into the classroom. K.W.P. admitted that he "didn't want to go with the officer" and that he was "attempting to not go with the police officer." *Id.* at 17–18. He also admitted he was "trying to get away" and "wanted to stand up for [himself]." *Id.* at 18. Officer Craddock bent down to K.W.P.'s level and said, "Son, I need you to calm down." Pl.'s Suggestions in Opp'n to Defs.' Mot. for Summ. J. at 25, ¶ 38. K.W.P. told Officer Craddock that he "didn't want to go with [him]." Defs.' Suggestions in Supp. of Mot. for Summ. J., Ex. 2, K.W.P. Dep., at 18. K.W.P. admitted that he was "resisting going with him" and "didn't want to cooperate with the officer." *Id.* According to K.W.P. he "tried to calm down, . . . but [he] couldn't." *Id.*

K.W.P. recalled Officer Craddock telling him "several times to stop walking away." *Id.* Officer Craddock put his hand on K.W.P.'s back to guide him in the direction that Officer Craddock was walking. Eventually, Officer Craddock "grabbed [K.W.P.'s] [left] wrist." *Id.* During this time, K.W.P. admitted he was "crying real loud" and "screaming." *Id.* K.W.P. recalled "jerking [his] body away" because he has

-4-

"a problem with people just grabbing [his] wrists and like trying to make [him] go somewhere." *Id.* K.W.P. admitted that during the encounter, Officer Craddock told him that he "wasn't in trouble." *Id.* Yet, K.W.P. testified that when Officer Craddock tried to grab his left wrist, K.W.P. "tr[ied] even more to get away from him." *Id.* K.W.P. agreed that he "could have got[ten] hurt" when he was "trying to go in the opposite direction and [Officer Craddock] [was] trying to pull [K.W.P.] towards the front office." *Id.* at 19. K.W.P. admitted that he was "aggressively trying to pull away." *Id.* When Officer Craddock reached out his arm to block K.W.P. from getting away, K.W.P. tried to push past him. K.W.P. continued to forcefully pull away from Officer Craddock's grasp. K.W.P. began crying. Officer Craddock told K.W.P., "Son, if you don't calm down, I'm going to have to put the cuffs on." Pl.'s Suggestions in Opp'n to Defs.' Mot. for Summ. J. at 28, ¶ 49. K.W.P. saw a handrail on the side of the hallway and grabbed it.

Officer Craddock handcuffed K.W.P. with his hands behind him.[2] K.W.P. admitted getting "more upset after [Officer Craddock] put the handcuffs on" him and that he was "still trying to get away." Defs.' Suggestions in Supp. of Mot. for Summ. J., Ex. 2, K.W.P. Dep., at 19. Officer Craddock double-locked the handcuffs so they would not tighten on K.W.P.'s wrists. K.W.P. finally "got tired and stopped trying to resist what was happening to him." Pl.'s Suggestions in Opp'n to Defs.' Mot. for Summ. J. at 31, ¶ 58. According to K.W.P., once in the front office, he obeyed Officer Craddock's directions, sat in a chair, and did not attempt to leave.

Principal Wallace first saw K.W.P. while he was seated in the front office and in handcuffs. Principal Wallace did not advise Officer Craddock to remove the handcuffs. Principal Wallace had a prior history with K.W.P., having restrained him

---

[2]The amount of time that elapsed between Officer Craddock's arrival to the classroom and the handcuffing of K.W.P. is not established in the record.

Appellate Case: 17-3602     Page: 5     Date Filed: 08/01/2019 Entry ID: 4814446

a couple of months prior.[3] Principal Wallace left to go to an adjoining office to complete unrelated paperwork. Officer Craddock also left the front office. When K.W.P.'s father arrived, only the secretary was present in the front office. K.W.P.'s father then left the office to retrieve Officer Craddock. K.W.P.'s father asked Officer Craddock why he had handcuffed K.W.P. Officer Craddock responded that he did it for "safety." Defs.' Suggestions in Supp. of Mot. for Summ. J., Ex. 8, Wiley Dep., at 3, *K.W.P. v. Kan. City Pub. Schs.* (W.D. Mo. Aug. 30, 2017), ECF No. Doc. 70-8. According to K.W.P.'s father, Officer Craddock told him that "he made a split decision of what he thought was right and [took K.W.P.] . . . out of the classroom . . . and [took] him out into the hallway and tr[ied] to calm him down or resolve . . . what he thought was the problem in the situation." *Id.* When Officer Craddock and K.W.P.'s father returned to the front office, Officer Craddock removed the handcuffs from K.W.P.

---

[3]In February 2014, Principal Wallace witnessed K.W.P. punch a student while in line after a fire drill. Principal Wallace advised K.W.P. to keep his hands to himself; in response, K.W.P. responded, "Quit talking to me." Defs.' Suggestions in Supp. of Mot. for Summ. J., Ex. 3, Wallace Dep., at 3, *K.W.P. v. Kan. City Pub. Schs.* (W.D. Mo. Aug. 30, 2017), ECF No. Doc. 70-3. Principal Wallace advised K.W.P. that his response was unacceptable and that she was going to call his mother. K.W.P. "got mad, and he tried to leave the school playground, which [Principal Wallace] would not allow him to do." *Id.* Principal Wallace grabbed K.W.P. by the wrist "to guide him into the office so that [she] could call [his] [m]om." *Id.* K.W.P. was "screaming the whole way and pulling and resisting, trying to pull away from [Principal Wallace]." *Id.* K.W.P. confirmed that he was, in fact, "trying to get away from [Principal Wallace]." Defs.' Suggestions in Supp. of Mot. for Summ. J., Ex. 2, K.W.P. Dep., at 9. Once in the office, Principal Wallace called K.W.P.'s mother and told her that K.W.P. "was trying to leave out of her office." Defs.' Suggestions in Supp. of Mot. for Summ. J., Ex. 1, Primm Dep., at 8, *K.W.P. v. Kan. City Pub. Schs.* (W.D. Mo. Aug. 30, 2017), ECF No. Doc. 70-1. Principal Wallace also advised K.W.P.'s mother that she "restrained [K.W.P.] because she didn't want him to run out into the street." *Id.*

Appellate Case: 17-3602     Page: 6     Date Filed: 08/01/2019 Entry ID: 4814446

K.W.P. was handcuffed for a total of 20 minutes. For 15 of those 20 minutes, K.W.P. was seated in the front office. The handcuffs made K.W.P.'s wrists tender and red. He also alleged that he suffered mental and emotional distress.

b. *Procedural History*

K.W.P. sued KCPS, Officer Craddock, and Principal Wallace for violations of K.W.P.'s rights under the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983. The complaint alleged that Officer Craddock unreasonably seized K.W.P. and used excessive force by handcuffing him and failing to promptly remove the handcuffs. He alleged that Principal Wallace approved Officer Craddock's seizure by failing to instruct Officer Craddock to remove the handcuffs despite K.W.P. posing no imminent threat to anyone and complying with instructions. KCPS was sued for failure to train and supervise Officer Craddock on the use of handcuffs on elementary-age children. Officer Craddock and Principal Wallace moved for summary judgment based on qualified immunity on the claim of unreasonable seizure and excessive force, and KCPS moved for summary judgment on the municipal liability claim.

The district court denied the defendants' summary judgment motions because of disputed material facts. Specifically, it concluded that "extensive factual disputes" prevented it from determining "whether Officer Craddock deprived [K.W.P.] of his constitutional rights when he handcuffed [K.W.P.] in the hallway." *K.W.P. v. Kan. City Pub. Sch.*, 296 F. Supp. 3d 1111, 1118 (W.D. Mo. 2017). The court determined that

> the following facts are genuinely disputed—whether [K.W.P.] was screaming upon Officer Craddock's arrival to the classroom; whether [K.W.P.] attempted to flee from Officer Craddock's grasp; whether [K.W.P.] continued to scream in the hallway with Officer Craddock; whether [K.W.P.] posed a safety threat once in the hallway; the time

-7-

elapsed from Officer Craddock's arrival to the handcuffing; and whether anyone else was in the hallway and at risk due to [K.W.P.'s] behavior.

*Id*. (internal citations omitted). According to the court, it was not able "to point to sufficient undisputed facts to support a finding of qualified immunity at this stage." *Id*. "For the same reason," the district court concluded it could not "determine whether the right was so clearly established that a reasonable officer would have realized that his actions were unlawful." *Id.*

The court also concluded that it was "unable to decide whether Office[r] Craddock is immune from suit for the decision to keep [K.W.P.] in handcuffs in the front office because too many facts are in dispute." *Id.* at 1119. The court identified the following facts as "genuinely disputed—whether [K.W.P.] was screaming in the front office; whether [K.W.P.] posed a safety threat once in the front office; and how long [K.W.P.] was handcuffed." *Id*. (internal citations omitted). Thus, the court was "unable to point to sufficient undisputed facts to support a finding of qualified immunity at this stage." *Id.*

Because the court found it "unclear whether a deprivation occurred," the court likewise determined that it was "unable to point to sufficient undisputed facts to support a finding of qualified immunity" in Principal Wallace's favor. *Id.*

The district court also denied summary judgment to KCPS due to the existence of disputed material facts. While neither party disputed "that KCPS provided Officer Craddock with handcuffs" and did not "provide training specific to handcuffing minors," the court concluded that "to prevail on a failure to train claim, [K.W.P.] must show a deprivation of a federal right caused by a policy or custom. Because so many material facts [were] disputed . . . , th[e] [c]ourt denie[d] summary judgment for KCPS on the grounds of municipal liability." *Id.* at 1121.

-8-

## II. *Discussion*

On appeal, the defendants argue that, construing the facts in the light most favorable to K.W.P., (1) Officer Craddock did not violate K.W.P.'s constitutional rights in handcuffing K.W.P., and (2) Officer Craddock and Principal Wallace did not violate his rights by keeping him in handcuffs once seated in the front office. They assert that Officer Craddock's and Principal Wallace's actions were reasonable based on "(1) the severity of K.W.P.'s conduct, (2) the fact that he was a safety threat, (3) he was aggressively resisting, and (4) he had a history of being a flight risk and engaging in unsafe behavior." Appellants' Br. at 12. They also argue that neither Officer Craddock nor Principal Wallace violated a clearly established constitutional right. Thus, they assert, Officer Craddock and Principal Wallace are entitled to qualified immunity on K.W.P.'s claim of unreasonable seizure and excessive force. Finally, they argue that KCPS was entitled to summary judgment on K.W.P.'s municipal liability claim because (1) "no employee of KCPS violated K.W.P.'s constitutional rights," and (2) "no evidence [exists] that . . . KCPS's training practices were inadequate, . . . that it was deliberately indifferent to the rights of others such that its failure to train reflects a deliberate or conscious choice by KCPS, or . . . [that] KCPS's alleged deficiency 'actually caused' K.W.P.'s injury." *Id.* at 21–22 (quoting *City of Canton v. Harris*, 489 U.S. 378, 391 (1989)).

### A. *Qualified Immunity*

We will first address Officer Craddock's and Principal Wallace's arguments that they are entitled to qualified immunity on K.W.P.'s claim of unreasonable seizure and excessive force.

Courts apply a two-part test in determining whether a government official is entitled to qualified immunity:

-9-

First, "whether the facts alleged, construed in the light most favorable to [the plaintiff], establish a violation of a constitutional or statutory right," and second, "whether that right was clearly established at the time of the alleged violation, such that a reasonable official would have known that her actions were unlawful."

*Clayborn v. Struebing*, 734 F.3d 807, 809 (8th Cir. 2013) (alteration in original) (quoting *Keil v. Triveline*, 661 F.3d 981, 985 (8th Cir. 2011)). "If the answer to either question is no, then [a defendant] is entitled to qualified immunity." *Doe v. Flaherty*, 623 F.3d 577, 583 (8th Cir. 2010). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"We review a denial of summary judgment on the grounds of qualified immunity de novo." *Nord v. Walsh Cty.*, 757 F.3d 734, 738 (8th Cir. 2014). "Jurisdiction over these interlocutory appeals reaches only to issues of law . . . ." *Ferguson v. Short*, 840 F.3d 508, 510 (8th Cir. 2016). Thus, "we lack jurisdiction to review the denial of summary judgment based on the pretrial record showing a genuine dispute of material fact on a qualified-immunity issue." *Id.*

Here, the district court denied qualified immunity to Officer Craddock and Principal Wallace because it determined that "extensive factual disputes" exist. *K.W.P.*, 296 F. Supp. 3d at 1118. "True, but that is not the correct inquiry. The correct inquiry is whether, even if we construe the facts in a light most favorable to [K.W.P.], a reasonable official in [Officer Craddock's or Principal Wallace's] position would have known that [he or she] was violating the [C]onstitution . . . ." *Estate of Walker v. Wallace*, 881 F.3d 1056, 1060 (8th Cir. 2018). "The mere existence of some factual dispute is not enough to defeat this court's jurisdiction over an interlocutory appeal: If the disputed facts are not material to this legal question, 'the denial of summary

-10-

judgment is [immediately] reviewable as a question of law.'" *Gonzales v. Dallas Cty., Tex.*, 249 F.3d 406, 411 (5th Cir. 2001) (quoting *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000)) (alteration corrects omission in *Gonzales*). "Thus, a defendant challenging the denial of a motion for summary judgment on the basis of qualified immunity 'must be prepared to concede the best view of the facts to the plaintiff and discuss only the legal issues raised by the appeal.'" *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007) (quoting *Gonzales*, 249 F.3d at 411). Therefore, in assessing K.W.P.'s claim, we must construe the facts in the light most favorable to K.W.P. to determine whether a constitutional violation occurred and whether any violation of a constitutional right was clearly established. *See id*.

### 1. *Constitutional Violation*

K.W.P. has brought a claim of unreasonable seizure and excessive force against Officer Craddock and Principal Wallace. K.W.P.'s allegations that Officer Craddock unreasonably seized him *and* used excessive force in handcuffing him with Principal Wallace's approval are intertwined. *See Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1304 (11th Cir. 2006) (stating that the "excessive force claim is not an independent claim, but rather is subsumed in [the] illegal seizure claim").

The Supreme Court has previously held that "the legality of a search of a student . . . depend[s] simply on the reasonableness, under all the circumstances, of the search." *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985) (involving school official's search of a student). A two-fold inquiry applies in determining whether such search is reasonable: "first, one must consider 'whether the . . . action was justified at its inception'; second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id*. (ellipsis in original) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). This standard balances "the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the

Appellate Case: 17-3602     Page: 11     Date Filed: 08/01/2019 Entry ID: 4814446

schools." *Id.* It "neither unduly burden[s] the efforts of school authorities to maintain order in their schools nor authorize[s] unrestrained intrusions upon the privacy of schoolchildren." *Id.* at 342–43. Instead, "[b]y focusing attention on the question of reasonableness, the standard . . . spare[s] teachers and school administrators the necessity of schooling themselves in the niceties of probable cause and permit[s] them to regulate their conduct according to the dictates of reason and common sense." *Id*. at 343. But it also "ensure[s] that the interests of students will be invaded no more than is necessary to achieve the legitimate end of preserving order in the schools." *Id*.

We have held that *T.L.O.*'s reasonableness standard governs *law enforcement searches* that school officials initiate. *Shade v. City of Farmington*, 309 F.3d 1054, 1061 (8th Cir. 2002) ("Because school officials initiated the investigation and search of Shade in furtherance of the school's interest in maintaining a safe learning environment, and because they asked officers to assist them in furtherance of that interest, we hold that *T.L.O.*'s two-part inquiry governs the lawfulness of the search conducted by Officer Dau."). We have not previously determined whether *T.L.O.*'s reasonableness standard governs law enforcement seizures of *students*. *Cf. Burlison v. Springfield Pub. Sch.*, 708 F.3d 1034, 1039–40 (8th Cir. 2013) (applying *T.L.O.* to the search and seizure of a student's backpack).

Our sister circuits are divided on whether to apply *T.L.O.*'s reasonableness standard or the objective reasonableness standard set forth in *Graham v. Connor*, 490 U.S. 386 (1989), to law enforcement seizures of students.[4] *Compare Gray*, 458 F.3d

---

[4]In *Graham*, the Supreme Court determined that "[t]he Fourth Amendment's objective reasonableness standard governs a claim that an officer used excessive force

-12-

at 1304 ("apply[ing] the reasonableness standard articulated in . . . *T.L.O.* . . . to school seizures by law enforcement officers"), *with E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 179 (4th Cir. 2018) (applying *Graham* standard to school resource officer's seizure of student); *Hawker v. Sandy City Corp.*, 591 F. App'x 669, 674 (10th Cir. 2014) (applying *Graham* standard to school resource officer's seizure of student). Some courts have opted to apply both the *Graham* and *T.L.O.* standards in analyzing a claim of unreasonable seizure and excessive force. *See, e.g.*, *C.B. v. City of Sonora*, 769 F.3d 1005, 1030 (9th Cir. 2014) (en banc); *Hoskins v. Cumberland Cty. Bd. of Educ.*, No. 2:13-cv-15, 2014 WL 7238621, at *11 (M.D. Tenn. Dec. 17, 2014).

Applying the *T.L.O.* standard, the Eleventh Circuit has held "that a law enforcement officer, acting as a school resource officer, who handcuffs a *compliant* nine-year-old child for *purely punitive purposes* has unreasonably seized the child in violation of the Fourth Amendment." *Gray ex rel. Alexander v. Bostic*, 720 F.3d 887,

---

'in the course of making an arrest, investigatory stop, or other 'seizure.'" *Brossart v. Janke*, 859 F.3d 616, 624 (8th Cir. 2017) (quoting *Graham*, 490 U.S. at 388). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. When applying the objective reasonableness standard, we must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. We judge "[t]he 'reasonableness' of a particular use of force . . . from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The objective reasonableness standard "embod[ies] allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

-13-

892 (11th Cir. 2013) (emphases added). In that case, a nine-year-old child threatened to "do something" physically to her physical education coach after the coach told her to "[c]ome to the wall" in gym class for not complying with his instructions. *Gray*, 458 F.3d at 1300 (alteration in original). A school resource officer witnessed the exchange and intervened. *Id.* at 1301. He escorted the child out of the gym and into a lobby area. *Id.* The officer then handcuffed the child, stating, "'[T]his is how it feels when you break the law,' and '[T]his is how it feels to be in jail.'" *Id.* (alterations in original). The child began crying. *Id.* The handcuffs remained on the child for five minutes. *Id.* The reason the officer detained and handcuffed the student was "'to impress upon her the serious nature of committing crimes that can lead to arrest, detention or incarceration' and 'to help persuade her to rid herself of her disrespectful attitude.'" *Id.* The child brought claims against the officer for excessive force and unreasonable seizure. *Id.* at 1302. The district court denied the officer's motion for qualified immunity, and the officer appealed. *Id.* at 1303.

The court, applying *T.L.O.*'s first prong, concluded that the officer "stopping [the child] to question her about her conduct was reasonable" because he had "witnessed [the child] threaten to do something physically to her teacher." *Id.* at 1305. But, under *T.L.O.*'s second prong, the court determined that "the handcuffing was excessively intrusive given [the child's] young age *and the fact that it was not done to protect anyone's safety*." *Id.* at 1306 (emphasis added). The facts taken in the light most favorable to the student showed that when the officer handcuffed the child, "there was *no indication of a potential threat to anyone's safety*. The incident was over, and [the child], after making the comment, had promptly complied with her teachers' instructions." *Id*. (emphasis added). The court found "no evidence that [the child] was gesturing or engaging in *any further disruptive behavior*." *Id*. (emphasis added). Instead, the child "had cooperated with her teachers and *did not pose a threat to anyone's safety*." *Id*. (emphasis added). In emphasizing that the child posed no safety threat, the court cited the officer's admission "that he handcuffed [the child]

-14-

to persuade her to get rid of her disrespectful attitude and to impress upon her the serious nature of committing crimes. In effect, [the officer's] handcuffing of [the child] was his attempt to punish [her] in order to change her behavior in the future." *Id.* As a result, the court held that the officer's handcuffing of the child constituted a violation of her Fourth Amendment rights. *Id.*

The Fourth Circuit reached a similar conclusion in *E.W.* by applying the *Graham* standard; in that case, the court concluded that a school resource officer's decision to handcuff "a calm, compliant ten-year-old" child for fighting with another student three days prior was objectively unreasonable and violated the student's right to be free from excessive force. *E.W.*, 884 F.3d at 180. At the outset, the court noted that the undisputed facts showed "a *calm, compliant ten-year-old* being handcuffed on school grounds because she hit another student during a fight *several days prior*." *Id.* (emphases added). The court concluded that the first *Graham* factor—severity of the offense—weighed against the student "because assault is an offense that can be considered violent if committed by any person, even a child." *Id.* However, the court observed such finding was "tempered" because "the offense [was] a misdemeanor." *Id.* The court next determined that the second *Graham* factor—whether the suspect poses an immediate threat to the safety of the officer or others—"weigh[ed] strongly in [the student's] favor." *Id.* The court concluded that the officer "could not have reasonably believed that [the student] presented any immediate risk of harm to anyone": the student "had no weapons and made no threats" and was "*calm and compliant* as [the officer] spoke to her." *Id.* at 181 (emphasis added). The court also pointed out the student "was in a closed office and surrounded by two school administrators and a deputy sheriff." *Id.* Based on this fact, the court found that the student "posed little threat even if she were to become aggressive." *Id.* Furthermore, the court explained, "[t]he significant time that had elapsed—without incident—since the fight on the bus . . . negate[d] any notion that [the student] posed an immediate threat." *Id.* Three days after the fight occurred, the officer interacted with the student,

-15-

who did not act "hostile or even disobedient. Rather, [the student] *remained seated and submissive during the entire interview, even as [the officer] placed the handcuffs on her*." *Id.* (emphasis added). The court further found that the officer "had no reason to think that the scuffle between [the students] was anything but an isolated incident" because the student "had no *prior behavioral issues* or involvement with law enforcement." *Id.* (emphasis added). The court determined that the student "posed no immediate threat to the safety of the officer or others to justify the use of handcuffs." *Id.* Finally, the court determined that the third *Graham* factor weighed in the student's favor because she was not "attempt[ing] to *resist or flee* from the office *at any point*." *Id.* at 182 (emphases added).

Viewing the facts in the light most favorable to the student, the court held that the totality of the circumstances demonstrated that the officer's actions were not objectively reasonable and therefore violated the student's right to be free from excessive force. *Id.* at 184. The court explained:

> [T]he circumstances here were by no means *tense, uncertain, or rapidly evolving* such that [the officer] was required to make any split-second decisions. [The officer] observed a ten-year-old girl *sit calmly and compliantly* in a closed office surrounded by three adults and answer questions about an incident with another little girl that had occurred *several days prior*.

*Id.* (emphases added). A reasonable officer would have considered the student's "small stature and *calm and compliant disposition*," as well as the fact that the student "attended school and sat in class among other children *without incident*" for the past three days. *Id.* at 184–85. Accordingly, the court held, "No reasonable officer confronted with this information would have determined that handcuffing [the student] for any amount of time was justified under the circumstances." *Id.* at 185.

-16-

The Ninth Circuit likewise determined—utilizing both the *T.L.O.* and *Graham* standards—that officers' "use of handcuffs on a calm, compliant, but nonresponsive 11-year-old child was unreasonable." *C.B.*, 769 F.3d at 1030. There, a sixth-grade student with ADHD experienced a period of unresponsiveness and refused to leave the playground. *Id.* at 1010. A coach called the police out of concern for the student's safety. *Id.* at 1011. A police chief arrived, and the coach whispered to him that the student was a "runner" not on his medicine, despite the fact the student had never previously attempted to run from her. *Id.* The coach advised the police chief she no longer wanted the student on school grounds. *Id.* The student "remained completely quiet and unresponsive throughout the time [the police chief] was with him." *Id.* Another officer arrived, learned that the student was a "runner," and tried to engage in conversation with the student. *Id.* The student "remained unresponsive." *Id.* The police chief instructed the officer to handcuff the student. *Id.* The student immediately complied with the officer's directive to put his hands behind his back, and the officer handcuffed the student. *Id.* The student began to cry upon being handcuffed. *Id.* The officers and coach then escorted the student from the playground and "directed [the student]—still in handcuffs—into the back seat" of the police car. *Id.* at 1012. "During this entire time, no one spoke to [the student] or explained to him why he had been handcuffed, that he was not under arrest, or where the police were taking him." *Id.* The student "remained handcuffed during the approximately thirty-minute ride to his uncle's place of business." *Id.* The student filed suit for, among other things, unlawful seizure and excessive force. *Id.* The case proceeded to trial, and the jury returned a verdict in favor of the student. *Id.* at 1015.

On appeal, the officers argued that the district court had erred in denying them judgment as a matter of law based on qualified immunity. *Id*. at 1022. The court first determined that "applying *T.L.O.*'s reasonableness standard d[id] not aid [the officers]" in defeating the student's unlawful seizure claim. *Id.* at 1024. While the officers were called to investigate a report of an "out of control" student, upon their

-17-

arrival to the school, the officers "found . . . a quiet but nonresponsive child." *Id.* The officers never "consider[ed] any less intrusive solutions, such as ordering [the student] to return inside the school building, or asking a guardian to pick up the child." *Id.* The court concluded that the circumstances demonstrated that "the officers' decision to seize [the student] and remove him from school grounds was not reasonable." *Id.* As a result, it held that "taking the evidence in the light most favorable to [the student], a reasonable jury could conclude that [the officers] violated [his] Fourth Amendment rights when they seized him and took him into custody." *Id.* at 1026.

The Ninth Circuit then separately analyzed the student's excessive force claim that the officers violated his Fourth Amendment rights by removing him from school and handcuffing him for 25 to 30 minutes. *Id.* at 1029. The court observed that "whether *T.L.O.* or *Graham* governed [the officers'] actions at any given moment [was] of little consequence" because the officers' "use of handcuffs on a calm, compliant, but nonresponsive 11-year-old child was unreasonable under either standard." *Id.* at 1030. While the officers were told the student might be a "runner," the student "never did anything that suggested he might run away or that he otherwise posed a safety threat." *Id.* As a result, the court held "that the decision to use handcuffs on [the student] was unreasonable, notwithstanding [the coach's] unexplained statement that [the student] was a 'runner,'" and that the "decision to leave [the student] in handcuffs for the duration of the half-hour commute to his uncle's business—a commute that took place in a vehicle equipped with safety locks that made escape impossible—was clearly unreasonable." *Id.*; *see also Hoskins*, 2014 WL 7238621, at *6 (analyzing unreasonable seizure claim under *T.L.O.* and *Graham* standards and holding that an officer's handcuffing of an eight-year-old second grader with special needs, who had threatened and swung his fist at his teacher, constituted an unlawful seizure).

-18-

In contrast to *Gray*, *E.W.*, and *C.B.*, where the courts found violations of the students' constitutional rights, the Tenth Circuit applied *Graham* in holding that a school resource officer's use of force was reasonable against a nine-year-old boy when the officer arrested and performed a twist-lock on the student, who was suspected of stealing an iPad at school. *Hawker*, 591 F. App'x at 671. In that case, upon the officer's arrival to the school, she saw the student "sitting on the floor in the hallway against a wall." *Id.* The principal informed the officer that she wanted to file theft charges against the student. *Id.* The officer then advised the student, "We can do this the easy way by you talking to me, or we can do this the difficult way or hard way by you not talking to me." *Id.* (citation omitted). The student looked at the officer, but he said nothing. *Id.* The officer then "'grabbed' his arm and 'yanked' him up off the floor." *Id.* (citation omitted). The student responded by grabbing the officer's arm. *Id.* In response, the officer "put [the student] in a twist-lock, pushed him against the wall, and handcuffed him. [The student] kicked at [the officer] and cried 'You're hurting me.'" *Id.* (citation omitted). The officer then took the student to the principal's office and issued him a theft citation. *Id.* Subsequently, the student's parents brought suit against the officer for excessive force. *Id.* The sole issue on appeal was "whether [the officer's] use of a twist-lock to effectuate the arrest constitute[d] excessive force." *Id.* at 672.

Applying *Graham*, the Tenth Circuit determined that the use of the twist-lock was objectively reasonable based on the facts. The court concluded that the first *Graham* factor—the severity of the crime—weighed in favor of the student because the crime was misdemeanor theft offense and "relatively minor." *Id.* at 674. But it found that the second and third factors—immediate threat to safety and resisting arrest—weighed against the student because the officer "could objectively and reasonably view [the student's] grabbing her arm as resisting arrest and escalating a tense situation. For safety, it was objectively reasonable for [the officer] to deescalate the situation and command [the student's] compliance by using a twist-lock." *Id.* at

-19-

675. The court acknowledged the student's age (nine years old) and weight (67 pounds) as "factors in the totality-of-the circumstances reasonableness calculation," but it concluded that such "factors alone do not render force used against him unreasonable per se." *Id.* According to the court, "An arrestee's age and small demeanor do not necessarily undermine an officer's concern for safety and need to control the situation." *Id.* The key, according to the court, is if force was used "on an individual posing no immediate threat." *Id.* The court determined that a reasonable officer could have viewed the student's grabbing of the officer's arm "an act of violent resistance" and that officer's "actions in this case simply d[id] not rise to the level of a constitutional violation." *Id.* Therefore, the court held that the officer was entitled to qualified immunity. *Id.*

In the present case, K.W.P. avers that we need not resolve whether the *Graham* or *T.L.O.* standard applies because "the result in this case would be the same under either standard." Appellee's Br. at 16. We agree but reach a different conclusion as to the result. We hold that, applying either the *Graham* or *T.L.O.* standard, and construing the facts in the light most favorable to K.W.P., neither Officer Craddock nor Principal Wallace violated K.W.P.'s right to be free from unreasonable seizure and excessive force.

First, as to the initial handcuffing, unlike the calm, compliant children in *Gray*, *E.W.*, and *C.B.* who did not engage in further disruptive behavior and posed no risks to anyone's safety, K.W.P.'s own admissions indicate that he attempted to flee from Officer Craddock upon his removal from the classroom and that his escape efforts posed a safety risk to himself. K.W.P. does not challenge as unlawful Officer Craddock's initial removal of him from the classroom for being disruptive. Once removed from the classroom, K.W.P. resisted Officer Craddock's directive for K.W.P. to accompany Officer Craddock to the office. K.W.P admitted, among other things, that he "didn't want to go with the officer," was "attempting to not go with the police

-20-

officer," was "trying to get away," "wanted to stand up for [himself], told Officer Craddock that he "didn't want to go with [him]," was "resisting going with [Officer Craddock]," "didn't want to cooperate with the officer," "tried to calm down . . . but [he] couldn't," was "crying real loud" and "screaming" when Officer Craddock grabbed his left wrist, was "jerking [his] body away," "tr[ied] even more to get away from" Officer Craddock when he grabbed K.W.P's wrist, tried to push past Officer Craddock, continued to aggressively pull away from Officer Craddock's grasp, and grabbed a handrail. Suggestions in Supp. of Mot. for Summ. J., Ex. 2, K.W.P. Dep., at 17–18. K.W.P. further admitted that his actions could have resulted in him getting hurt. In applying the objective reasonableness standard to the undisputed facts, a reasonable officer could have concluded that K.W.P.'s admitted conduct constituted "an act of violent resistance." *Hawker*, 591 F. App'x at 675.

Second, K.W.P. challenges as unlawful the 15 minutes that he was seated in the front office and handcuffed. Once again, applying either the *Graham* or *T.L.O.* standard, neither Officer Craddock nor Principal Wallace violated K.W.P.'s right to be free from unreasonable seizure and excessive force in the extended handcuffing. Construing the facts in the light most favorable to K.W.P., K.W.P. had stopped resisting by the time that he reached the front office, sat in a chair pursuant to Officer Craddock's commands, and did not attempt to leave. Nevertheless, the case remains distinguishable from other cases in which courts have found extended handcuffing violative of the Fourth Amendment. Here, K.W.P. remained handcuffed in the front office for only 15 minutes; by comparison, the student in *C.B.* remained handcuffed for 25 to 30 minutes, 769 F.3d at 1029, and the student in *Hoskins* remained handcuffed for 45 minutes, 2014 WL 7238621, at *11. Our conclusion that no constitutional violation occurred also rests on K.W.P.'s behavior justifying the initial handcuffing. Unlike the students in *Gray*, *E.W.*, and *C.B.* who were complaint with the school resource officer from the outset of their encounter, K.W.P. had actively resisted Officer Craddock just prior to arriving to the front office. A reasonable

-21-

officer could conclude that, based on K.W.P.'s recent resistance, keeping him in handcuffs for 15 minutes until a parent arrived was a reasonable course of action and was necessary to prevent K.W.P. from trying to leave and posing harm to himself. *Cf. Hoskins*, 2014 WL 7238621, at *11 ("[T]he scope of the seizure—that is, the handcuffing of the child for forty-five minutes, *even after his parents arrived at the school and were present in the room with him*—was unreasonable." (emphasis added)).

Furthermore, Principal Wallace's failure to intervene and have Officer Craddock remove the handcuffs was reasonable in light of her previous experience with K.W.P. The undisputed facts show that just two months prior to the incident at issue, K.W.P. tried to leave the playground after getting mad at Principal Wallace for instructing him not to hit others. When Principal Wallace grabbed K.W.P.'s wrist to take him to the office to call his mother, K.W.P. actively resisted by trying to pull away from Principal Wallace.

Accordingly, we hold that, applying either the *Graham* or *T.L.O.* standard and viewing the facts in the light most favorable to K.W.P., neither Officer Craddock nor Principal Wallace violated K.W.P.'s right to be free from unreasonable seizure and excessive force and are therefore entitled to qualified immunity on this claim.

### 2. *Clearly Established*

Alternatively, "'even if the reasonableness of [Officer Craddock's and Principal Wallace's] actions was questionable,' [K.W.P.] cannot 'show that a reasonable [official] would have been on notice that [their] conduct violated a clearly established right.'" *Cravener v. Shuster*, 885 F.3d 1135, 1140 (8th Cir. 2018) (quoting *De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 896 (8th Cir. 2014)). "For a right to be clearly established, its contours must be 'sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" *Moore-Jones*

-22-

*v. Quick*, 909 F.3d 983, 985 (8th Cir. 2018) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam)). "'When determining whether an action was a clearly established constitutional violation, we look to the state of the law at the time of the incident,' here [April 2014].'" *Cravener*, 885 F.3d at 1140 (quoting *De Boise*, 760 F.3d at 896). "A case need not be 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Moore-Jones*, 909 F.3d at 985 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)). A plaintiff's failure "to 'identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment' is often fatal to a claim *outside of obvious cases*." *Id.* (emphasis added) (ellipsis in original) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam)).

"Our circuit subscribes to a broad view of what constitutes clearly established law; in the absence of binding precedent, a court should look to all available decisional law, including decisions of state courts, other circuits and district courts." *Tlamka v. Serrell*, 244 F.3d 628, 634 (8th Cir. 2001) (cleaned up). "Notice of constitutionally impermissible conduct may be provided by the Constitution itself or the decisions of the United States Supreme Court and the lower federal courts." *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 531 (8th Cir. 2009) (en banc).[5]

---

[5]We note that "[i]n a series of recent decisions, the Supreme Court has emphasized that for a plaintiff to overcome qualified immunity, existing precedent must have placed the constitutional question 'beyond debate.'" *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 989 (8th Cir. 2015) (quoting *City & Cnty. of S.F., Calif. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015)). The Supreme Court has assumed, without deciding, that "a controlling circuit precedent could constitute clearly established federal law." *Sheehan*, 135 S. Ct. at 1776 (quoting *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (per curiam)); *see also Reischle v. Howards*, 566 U.S. 658, 665–66 (2012) ("Assuming arguendo that controlling Court of Appeals' authority could be a dispositive source of clearly established law in the circumstances of this case, the Tenth Circuit's cases do not satisfy the 'clearly established' standard here.").

Here, K.W.P. relies on *C.B.* and *Gray* to show that it was clearly established in April 2014 "that a police officer's conduct in handcuffing a child constituted an obvious violation of the child's constitutional rights." Appellee's Br. at 35. We reject the notion that these cases gave notice to Officer Craddock and Principal Wallace that their conduct violated K.W.P.'s constitutional rights. First, while the Eleventh Circuit decided *Gray* in 2006, the Ninth Circuit decided *C.B.* in October 2014—*after* the incident here occurred in April 2014. Therefore, *C.B.* could not have given Officer Craddock or Principal Wallace notice of their alleged unconstitutional conduct. *See Cravener*, 885 F.3d at 1140.

Second, *C.B.* and *Gray* are distinguishable from the present case. In *Gray*, the Eleventh Circuit concluded that "[e]very reasonable officer would have known that handcuffing a *compliant* nine-year-old child for *purely punitive purposes* is unreasonable." 458 F.3d at 1307 (emphases added). In *C.B.*, the Ninth Circuit similarly concluded that "[i]t is beyond dispute that handcuffing a small, *calm* child who is surrounded by numerous adults, who *complies with all of the officers' instructions*, and who is, by an officer's own account, *unlikely to flee*, was completely unnecessary and excessively intrusive." 769 F.3d at 1030–31 (emphases added). As explained *supra*, by K.W.P.'s own admission, he was *not* compliant; instead, he actively resisted Officer Craddock and attempted to get away from his grasp. This active resistance precipitated the handcuffing of K.W.P. and it was not for purely punitive reasons.

We likewise reject K.W.P.'s argument that "Officer Craddock's conduct in handcuffing K.W.P. in the hallway also constituted an obvious violation of K.W.P.'s constitutional rights." Appellee's Br. at 37. Both the Fourth and Tenth Circuits have granted qualified immunity to school resource officers despite the officer handcuffing "a calm, compliant ten-year-old," *E.W.*, 884 F.3d at 186, and handcuffing a student

-24-

who "posed no flight risk and 'was not combative,'" *A.M. v. Holmes*, 830 F.3d 1123, 1130 (10th Cir. 2016) (citation omitted). If school resource officers who had handcuffed compliant children received qualified immunity, then no obvious violation results from Officer Craddock's handcuffing of K.W.P, an admittedly resistant child.

In summary, we hold that the district court erred in denying qualified immunity to Officer Craddock and Principal Wallace.

## B. *Municipal Liability*

Because we hold that no violation of K.W.P.'s constitutional rights occurred, we necessarily hold that the district court erred in denying summary judgment to KCPS on K.W.P.'s municipal liability claim for failure to train and supervise its school resource officers on the use of handcuffs on young children. *See Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007) ("Without a constitutional violation by the individual officers, there can be no § 1983 or *Monell* failure to train municipal liability.").

## III. *Conclusion*

Accordingly, we reverse the district court's denial of summary judgment to Officer Craddock, Principal Wallace, and KCPS and remand for entry of summary judgment in their favor on K.W.P.'s claims.

———————————————

Appellate Case: 17-3602    Page: 25    Date Filed: 08/01/2019 Entry ID: 4814446